# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GERALD L. POLZIN,

                Plaintiff,

       -vs-                          Case No.   13-CV-147

PETER ERICKSEN, CO KAZIK,
MICHAEL BAENEN, and JOHN DOES,

                Defendants.

## DECISION AND ORDER

The plaintiff, Gerald L. Polzin, is a Wisconsin state prisoner who filed this pro se civil rights action pursuant to 42 U.S.C. § 1983. He was granted leave to proceed *in forma pauperis* on an excessive force claim against defendant Todd Kazik and an equal protection claim against defendants Peter Ericksen, Michael Baenen, and John Does.[1] Polzin is also proceeding on supplemental state law claims under Wisconsin Administrative Code § DOC 306.11 and Wisconsin Statute § 302.08, as well as a state law battery tort claim against Kazik. The defendants have filed a motion for summary judgment which will be addressed herein.[2]

### STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

---

[1] The John Doe defendants will be dismissed because Polzin did not identify them.

[2] The defendants filed their original summary judgment motion along with supporting materials on November 4, 2013. They filed an amended motion for summary judgment on December 5, 2013, to cure the inadvertent omission of civil local rules from the original motion. *See* Civil L.R. 56(a)(1)(B) (E.D. Wis.). In response to the amended motion, Polzin asserts that he will rely on his response to the original motion. The Court will allow the amended motion and deny as moot the defendants' original motion for summary judgment.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS

### A. Parties and Claim

Polzin is incarcerated at Green Bay Correctional Institution (GBCI). The defendants are employed by the Wisconsin Department of Corrections. Kazik is a correctional officer at GBCI and Ericksen is the security director at GBCI. Baenen, who is currently the GBCI warden, was employed as the deputy warden of GBCI at all times relevant.

Polzin's excessive force claim is based on allegations that Kazik placed handcuffs and waist restraints on him too tightly, causing injury to his right wrist. Polzin also challenges GBCI's

custom of restraining Treatment Center inmates who visit the library with handcuffs and waist restraints as violating the Equal Protection Clause of the Fourteenth Amendment. He claims that Segregation Unit inmates are not restrained with handcuffs and waist restraint yet are similarly situated to Treatment Center inmates.

**B. Segregation Unit and Treatment Center**

Inmates housed in the Segregation Unit are being retained in adjustment segregation, program segregation, or disciplinary separation due to major violations of rules and regulations. Due to the heightened security risk and behavioral issues involving Segregation Unit inmates, they are always escorted in leg restraints. When out of their cell, Segregation Unit inmates are also cuffed in wrist restraints behind their backs unless they are going to an activity where they will need to use their hands. In those situations, such as use of the law library, some meetings with Psychological Services or Health Services Units, and meeting with lawyers, inmates are cuffed in the front.

The Segregation Unit has two rectangular law libraries. Both were constructed to hold inmates who generally exhibit behavior that is continually disruptive and dangerous. Both have a door with a window and one of the rooms has an additional window. All of the windows are visible from the control center and from the hallway. When an inmate housed in the Segregation Unit wishes to use a law library, he is placed in leg restraints, a waist belt, and wrist restraints with the cuffs in front. Once in the library, the inmate's waist belt is unfastened and the cuffs are attached to a tether. The tether is either attached to a u-bolt on the computer station or the chair. The chair is secured to the floor.

The computer is fully encased and secured behind a Plexiglas window. The inmate has access to the keyboard and mouse. An inmate can move his hands to use the computer, but movement is restricted. The door is locked while the inmate is in the law library. The inmate's legs

3

and wrists remain in restraints while using the library.  However,  it is not necessary to leave an inmate's wrist cuffs attached to the waist restraint given the highly secured nature of the room.  An inmate can be tethered to the computer area, the computer is encased behind Plexiglass, the chair is bolted down, and the entire room can be easily viewed for monitoring.

The restraint practice used to restrain inmates in the Segregation Unit law libraries was implemented due to legitimate safety and security concerns.  It was implemented as a way to allow inmates access to a computer while also allowing the prison to operate in a safe and secure manner.  In Baenen's and Ericksen's professional opinions, this is the least restrictive way to restrain these particular inmates in this particular room while ensuring the safety and security of staff, inmates, and property.

Once an inmate has shown enough acceptable behavior in the Segregation Unit, he often is transferred to the Treatment Center prior to being released back into the general population. One of the purposes of the Treatment Center is to provide a transitional environment for inmates moving from a more restricted status back to general population.  The Treatment Center houses a wide variety of inmates, including inmates receiving treatment from the Health Services or Psychological Services Units, inmates on administrative confinement or temporary lockup, inmates that have been in segregation for a long time and are preparing to transition to general population, and inmates going through the Step Program.  Most inmates are still in segregation status while housed at the Treatment Center.

Polzin was in the Step Program on the day of the alleged excessive force incident. The Step Program is a program run by GBCI to further its goal of improving inmate behavior and preparing the inmate for return to the general population.  An inmate is placed into the Step Program at an appropriate level when he receives disciplinary segregation time as a result of a conduct report

4

disposition. The Step Program grants privileges and responsibilities in "steps" to an inmate who demonstrates acceptable behavior over time. The Segregation Review team reviews each inmate in the Step Program every thirty days and makes recommendations related to an inmate's status to the security director and the warden. The majority of the "Step inmates" housed in the Treatment Center have attained Step Three (the last step) based on such factors as having demonstrated appropriate/improved attitude, adjustment, conduct, and program participation. As a result of their overall improved behavior, the inmates who have advanced to Step Three are given increased privileges and fewer restrictions. After achieving the goals of Step Three, inmates are typically transferred back to general population.

The building that now houses the Treatment Center was converted to the Treatment Center in 2007. It was previously an orientation unit that received all inmates when they first arrived at GBCI. The Treatment Center building was not originally constructed to house inmates who demonstrate behaviors common to inmates who have been in segregation status. Consequently, the law library within the Treatment Center was not originally constructed to hold segregation status inmates.

The Treatment Center law library is an L-shaped room; one section of the room is out of view from the door. A glass window that accesses outside is located in this corner area. There is one computer in the Treatment Center law library. Because the inmates in the Treatment Center pose less of a security threat than the Segregation Unit inmates, the computer is not encased behind a Plexiglas window; it sits out freely. The inmate has access to the law library keyboard. The chair by the computer is free standing, not bolted to the ground. The door to the law library is designed so anyone inside the room can leave at any time. It does lock from the outside, but this only prevents someone from entering the room.

Inmates using the Treatment Center law library are restrained according to the perceived level of risk they pose. There is no written policy establishing how to restrain Treatment Center inmates who use the law library. The practices described below are considered the standard practices that are uniformly taught to officers by their supervisors at GBCI.

Some inmates in the Treatment Center pose a low enough risk to safety and security that they are allowed to use the law library with no restraints. This includes general population inmates who are in the Treatment Center to receive medical or psychological services. This also includes "transition inmates" who have completed their segregation term and are transitioning to general population.

Meanwhile, Step Program inmates housed in the Treatment Center wear wrist restraints attached to wrist belts while being escorted to and using the law library. Step Program inmates are still considered to be in segregation status. While Step Program inmates have earned more trust by the time they move from the Segregation Unit to the Treatment Center, they nevertheless cannot be trusted to the point of allowing their hands to be free from their waists while working at a free standing computer. This is especially true since the room does not provide officers with the capability of securing inmates to any portion of the room. If these inmates were not restrained with both hands attached to the waist belt, the computer and keyboard would be at greater risk of destruction. Besides destroying items, inmates have been known to sometimes steal pieces of items such as screws and batteries and take them back to their cells, creating a security risk.

The restraint procedure used on Step Program inmates in the Treatment Center helps to minimize these risks by preventing inmates from having as free a range of motion. The best way to protect equipment, staff, and other inmates is to use wrist restraints attached to a waist belt for higher risk inmates. Attaching handcuffs to the waist does not immobilize an inmate's hands. It only

6

restricts or limits the movement of arms for the safety and security of staff, inmates, and property. Using this method, inmates have access to the computer, but their ability to cause a disturbance is minimized.

Although inmates in the Step Program may be housed in the Treatment Center or the Segregation Unit, inmates using the Segregation Unit law library are restrained differently from inmates using the Treatment Center law library because the two groups of inmates pose a different level of threat and they are working in differently constructed rooms. The equipment in the Segregation Unit law libraries is much more secure than the Treatment Center law library and is housed in an area in which inmate movement is extremely limited. If a Step Program inmate in the Treatment Center law library were allowed to have their handcuffs detached from their waist restraints, given the unique circumstances of that room, it would pose a threat to the security of staff, inmates, and property.

The restraint practice used to restrain inmates in the Treatment Center law library was implemented due to legitimate safety and security concerns. It was implemented as a way to allow inmates access to a computer while also allowing the prison to operate in a safe and secure manner. In Baenen and Ericksen's professional opinion, this is the least restrictive way to restrain these particular inmates in this particular room while ensuring the safety and security of staff, inmates, and property. As warden, Baenen is familiar with the resources available to GBCI, and he is aware that GBCI as an institution has limited resources. It is not currently within GBCI's resources to require an officer to be in the Treatment Center law library for direct supervision, or to remodel the law library, or to change the lock on the door. Baenen also does not believe that such changes are necessary. It is Baenen's professional opinion that the Treatment Center law library space works as it is set up, given the level of risk of inmates assigned to the area generally present.

7

The Treatment Center law library has a chair that is bolted to the floor. The chair is used during conduct report hearings that are held in the Treatment Center law library room.

## C. GBCI Practice of Restraining Treatment Center Inmates in the Law Library

Kazik's practice when he brings a Step Program inmate to the Treatment Center law library is to place the inmate in wrist and waist restraints. He begins the escort by opening the trap of the cell door and instructing the inmate to put his hands out in front of him and through the trap. Kazik then places the cuffs on the inmate's wrists and visually checks for proper tightness. Proper tightness allows for the cuffs to move without indenting the skin, but not loose enough to slide the hands through. If an inmate complains about tightness, Kazik double checks for proper fit. Once the cuffs are properly fitted, Kazik escorts the inmate to the law library. Kazik then leaves while the inmate is usually allowed up to one hour to work in the library. This is the procedure that is supposed to be used by all officers who escort Step Program inmates to the Treatment Center law library. Kazik was not given any written policies describing this practice, rather, Kazik's supervisor taught him the practice.

Ericksen is familiar with and has reviewed the practice which Kazik uses concerning his method for applying and checking the tightness of handcuffs. In Ericksen's opinion and based upon his personal experience as a security director, Ericksen believes Kazik's method to be an appropriate means of applying and checking cuffs.

To a certain extent, tightening an inmate's restraints to the proper tightness to be effective requires a judgment call by the officer. It is not an exact science. There is a range of acceptable tightness in properly fitting an inmate's wrist and waist restraints. All inmates have differently proportioned hands, wrists, and bodies. The wrist restraints should be loose enough for the cuffs to move without indenting the skin, but not loose enough to slide the inmate's hand

through.

Kazik tries to apply restraints to the proper tightness every time. When applying handcuffs, Kazik does not apply them so tightly that they would cause indentations into an inmate's wrists. He only applies the amount of force that is necessary to ensure inmates are not able to slip out of the handcuffs. If an inmate complained to Kazik that handcuffs were on too tightly, Kazik would ensure that he could move the cuffs without indenting the skin. If Kazik could, then he would consider the handcuffs to be properly fitted. If Kazik could not, then he would loosen the handcuffs accordingly. When applying waist restraints, Kazik only tightens them enough so that they are effective. Waist restraints are fitted properly if Kazik can slip one hand between the inmate's side and the waist restraint. If an inmate complains the waist restraint is too tight, Kazik checks the waist restraint by placing his hand between the inmate's side and the waist restraint. If Kazik could not slide his hand in between, he would loosen the waist restraint accordingly.

Inmates frequently complain that their restraints are on too tight and that they would like them to be loosened. Rarely are the restraints actually tighter than they are supposed to be. Nevertheless, whenever an inmate complains, Kazik ensures that the restraints are fitted properly. If an inmate moves his arms around too much while wearing properly fitted restraints, it could cause pain by forcing the handcuffs to dig into the wrists. Kazik often warns inmates that they can reduce discomfort they are feeling from properly fitted restraints by jerking their arms around less. Kazik is not authorized to loosen restraints beyond the proper fit. Restraints that are put on too loosely can create a risk that the inmate could slip out and pose a threat to the safety and order of the institution.

While Polzin was housed at the Treatment Center he used the law library multiple times. During these times he was made aware of the law library policy/custom for the Treatment Center. Prior to the incident that occurred on August 1, 2010, the correctional officers that placed

Polzin Treatment Center law library always made sure that the waist restraint was either off his waist or loose enough to reach the keyboard, mouse, write, take notes, and use the books without difficulty and pain.

**D. August 1, 2010, Incident**

Polzin was housed in the Treatment Center Unit from May 15, 2010, to August 7, 2010. At all times relevant to this lawsuit, Polzin was on disciplinary separation status, which is a form of segregation status. Polzin was going through the Step Program, and was at Step 3 on August 1, 2010.

On August 1st, 2010, at approximately 8:15 a.m., Kazik came to Polzin's cell to escort him to the Treatment Center law library. Polzin avers that Kazik opened Polzin's trap door and placed handcuffs on his wrists as tight as they would go, pinching Polzin's wrists and causing pain. Kazik then opened Polzin's cell door and told him to step out of the cell. Kazik disputes that he placed the handcuffs on Polin's wrists as tight as they would go. According to Kazik, he properly applied the restraints before escorting Polzin to the library.

Polzin stepped out of his cell and told Kazik that the handcuffs were too tight and hurt. Kazik refused to loosen the handcuffs. Kazik then placed the waist restraint which was attached to the handcuffs around Polzin's waist. Polzin avers that Kazik pulled the belt as tight as he could get it and secured the belt to his waist. Kazik disputes that he pulled the belt as tight as he could get it and that he improperly applied the restraints. Polzin told Kazik that the waist restraint was too tight and he refused to loosen it.

Kazik then escorted Polzin to the law library. When Polzin arrived in the law library, he again told Kazik that both the handcuffs and waist restraint were on too tight. Polzin asked Kazik how he was supposed to work in the law library with the handcuffs and waist restraint on so tight and

10

his hands secured down to his waist. Kazik stated that he was doing what he was supposed to do and that was the way Polzin had to work in the law library. Kazik again refused to loosen the handcuffs and waist restraint. Kazik then left the law library.

Polzin was compliant the entire time he was with Kazik. He followed Kazik's orders and he attempted to work in the law library. Polzin had pain in both of his wrists because the handcuffs were on so tight. He also had great difficulty reaching the computer, mouse, books, and writing because his hands were secured to his waist with the waist restraint on so tight. When Polzin attempted to write the tight handcuffs would pull or wrench on his wrists. Kazik disputes that Polzin had pain in his wrists caused by tight handcuffs and that Kazik improperly applied the restraints.

After forty-five minutes Polzin left the law library without permission because he could no longer take the pain in his wrists. Polzin left the law library and found Sergeant Platten at the sergeant's station. Polzin told Sergeant Platten that he could no longer work in the law library because of the pain he was in from the restraints being put on so tight. Sergeant Platten exited the cage and loosened the handcuffs and the waist restraint.

Polzin then went back to the law library to finish his time. He continued to have pain in both of his wrists. Kazik returned to the law library when Polzin's time was up to escort him back to his cell. According to Polzin, when Kazik took the restraints off of Polzin, he told Kazik that after forty-five minutes he had to find Sergeant Platten who had to loosen the handcuffs and waist restraint because of the pain they were causing him. Polzin avers that Kazik responded by telling Polzin that Inmate Harris, who was in the law library before Polzin, only lasted fifteen minutes because of the pain the handcuffs and waist restraint had caused him. After learning about this from Kazik, Polzin confirmed with inmate Harris that Kazik had placed restraints too tightly on him as well.

Kazik has no recollection about the incident that Polzin alleges occurred on August

1, 2010, concerning the use of restraints in the law library. However, Kazik has reviewed complaint GBCI-2010-16618 that was filed by Polzin and the response provided by GBCI. The institution's response includes a report of Kazik's response to the institution's investigation. The report on the inmate complaint states in relevant part:

> Inmate Polzin complains that Officer Kazik placed handcuffs on his [sic] so tight that they left deep marks on his wrist.
>
> Officer Kazik was contacted and said that, per restrictions, the inmate had to be in restraints with a waist chain. When he went to get inmate Polzin out of his cell, the inmate didn't want the belt placed on him. The officer informed him that due to the restriction he would have to wear it. The inmate then told the officer that he wanted the belt on loosely. The officer informed him that it would defeat the purpose of having the belt on in the first place. The belt was applied, and then the inmate stated that he wanted the handcuffs on loose. The officer informed him that if the cuffs were too loose his hands could slip through. He then properly applied the handcuffs.
>
> His request was received in HSU on 08/05/10. He complained of wrist pain due to restraints. He was seen and evaluated on 08/06/10 by RN Vanderkinter. The physical assessment revealed hands and wrists appeared within normal limits, no swelling or discoloration. Papillary refill was less than two seconds, hand grasps equal and

strong and intermittent fine tremor of both hands which dates back to 2002. The nurse addressed his discomfort and directed him to avoid long periods of repetitive inactivity's [sic] such as typing and writing that he reports are causing him discomfort. He was also instructed to use warm, moist compresses as needed. He was provided with ibuprofen per protocol. There is no documentation in the medical file to indicate that the inmate's wrists were injured due to restraints being placed on him.

I find no facts support the inmate's claim. It is accordingly recommended that this complaint is dismissed.

(Kazik Aff. ¶ 4, Exh. A.) Although Kazik has no specific recollection of the particular day, he is confident about his general practice and the procedures used to restrain inmates while using the Treatment Center law library computers. Upon reviewing the response, Kazik believe his response was honest and truthful.

**E. Polzin's Medical Care Folowing the Incident**

Dr. Richard Heidorn is a physician at GBCI. He has access to regularly maintained records of the Health Services Unit (HSU) at GBCI and has reviewed portions of Polzin's medical record which relate to his allegations that excessive force was used on him on August 1, 2010. On August 4, 2010, Polzin submitted a Health Service Request (HSR) stating:

On 8-1-10 I was placed in handcuffs that were too tight along with a waist restraint while working in the law library. I had to wrench on my wrist in order to write and use the keyboard, this went on for 45

minutes. The CO refuse to loosen them but the Sgt. later did I had marks in my wrist. My right wrist has pain on the bottom and side of it when I write and it is very sore when I wake up in the morning. I would like to be seen could I also get some Ibuprofen. Thanks.

An appointment was made for Polzin to be seen a nurse. (Heidorn Aff., ¶ 5, Exh. A, Bates No. 000016.)

On August 6, 2010, Polzin was seen by Nurse Vanderkinter. He complained of pain on the anterior right side half of his right wrist area and on the medial aspect of the right wrist. Polzin also reported pain with writing and typing activities. Nurse Vanderkinter's examination showed that Polzin's hands and wrist were within normal limits with no swelling or discoloration. Capillary refill (pinching of the finger tip for blood perfusion) was less than two seconds, which is normal. Polzin's hand grasps were equal and strong. Fine tremor-intermittently was noted of both hands as Polzin does have a history of tremors. Polzin had wrist restraints on at this appointment and he could easily move his fingers, hands, and wrist as directed without any problems noted or reported. Polzin was instructed to avoid long periods of repetitive activities such as typing or writing that cause him discomfort for the next several weeks and then to slowly increase periods of time that he does these activities as tolerated. Polzin was also instructed to use warm moist compresses as needed to the affected area. He was given Ibuprofen per protocol and told to follow-up as needed.

Polzin's medical records establish that on August 16, 2010, he was seen by a doctor regarding a tremor, constipation, and a hemorrhoid. According to Polzin, although the medical records do not reflect it, at that appointment he informed Dr. Heidorn that handcuffs were put too tightly on his wrists pinching and putting indentations into his wrists. Polzin further avers that he showed the doctor the area of his right wrist where he had pain and Dr. Heidorn examined it. Dr. Heidorn prescribed 600 milligrams of Ibuprofen to Polzin for six months.

On September 12, 2010, Polzin submitted a HSR stating that he was having right wrist pain and asking if there was anything else that could be done for his wrist. On September 29, 2010, Polzin was seen by Dr. Martin for complaints of right wrist pain. Polzin's pain would occur when he would bend his wrist but had minimal tenderness and his range of motion was good. The diagnosis was low grade tendinitis and Naproxen was prescribed.

Tendinitis is inflammation or irritation of a tendon (any one of the thick fibrous cords that attaches muscle to bone). The condition causes pain and tenderness along the length of the tendon. Although tendinitis can be caused by a sudden injury, the condition is much more likely to stem from the repetition of a particular movement over time. Most people develop tendinitis because their jobs or hobbies involve repetitive motions, which put stress on the tendons needed to perform the tasks. Tendinitis can also be caused by arthritis. Tendinitis is usually diagnosed based on patients' self-reported symptoms. An examination is also conducted. The examination would involve palpitating the tendon resulting in tenderness.

On November 9, 2010, Polzin was seen by Nurse Lemens requesting a medication change. Polzin reported issues with his tremor medication and also stated that the Naproxen was wearing off during the day causing him to have pain. Polzin was informed that he was already at the maximum dosage of Naproxen. He was given Tylenol to try when having break-through pain. On November 29, 2010, Dr. Heidorn saw Polzin for follow-up on various medical concerns, including right wrist pain. Dr. Heidorn's plan was for Polzin to continue taking Naproxen and to follow up in six months.

On April 12, 2011, Polzin was seen by Nurse Komorowski for complaints of right wrist pain on radial side—throbbing in wrist, up toward the palm side. Polzin reported that the medication was taking the edge off. Nurse Komorowski's examination reflected equal bilateral hand

strength and Polzin's right radial had a strong pulse. Capillary refill was less than three seconds, which was normal. There was no swelling or bruising noted of Polzin's right wrist and he was already taking Naproxen and Tylenol. Polzin was directed to continue his medications and an appointment was scheduled for Polzin to follow up with a physician. Polzin was also informed that this discomfort may not ever completely resolve.

On June 1, 2011, Polzin submitted a HSR to be seen by the physician for his hernia and wrist. On June 2, 2011, Polzin was seen by Dr. Martin for medical concerns, including right wrist pain. Polzin reported that his wrist was tender in the area between his thumb and wrist. He was given an injection of 30 milligrams of Depo Medrol (steroid) for pain.

On July 6, 2011, Polzin submitted a HSR wanting a second cortisone shot for his wrist pain. A response was sent to Polzin this same day stating that he was scheduled to be seen in approximately one week. On July 13, 2011, Polzin was seen by Nurse Lemens requesting another cortisone shot in his wrist. Polzin reported minimal improvement with the last injection. He denied any worsening of pain in his right wrist. Polzin was already taking Naproxen and Tylenol for discomfort. Polzin was instructed to continue with his current plan of care. Polzin was also explained that the healing process is slow if his pain was nerve-related.

July 13, 2011, was the last time Polzin was seen about complaints of right wrist pain. He has not requested to be seen for his wrist pain since July 13, 2011, the nurses told him that he may always have pain, it may take a long time to resolve and there is not much else that can be done. Polzin has been taking his medication for the pain as directed.

It is Dr. Heidorn's opinion to a reasonable degree of medical certainty that Polzin's tendinitis is more likely than not a repetitive stress injury. Extensive writing and typing can be a common cause of tendinitis. It is Dr. Heidorn's opinion to a reasonable degree of medical certainty

that if Polzin had experienced any bruising as a result of the August 1, 2010, use of handcuffs, the bruising would have still been visible when he was seen on August 6, 2010, because bruises do not tend to fade that quickly.

Polzin avers never had any problems or pain with his right wrist prior to August 1, 2010.

## F. Notice of Claim

On September 9, 2010, plaintiff served by certified mail a notice of claim, which is at issue in the present action. The Notice of Claim names Kazik and Ericksen, but not Baenen.

## ANALYSIS

## A. Equal Protection

The defendants contend that their restraint practices do not violate the Equal Protection Clause because Segregation Unit inmates are not similarly situated to Treatment Center inmates and because there is a rational basis for the different treatment. Polzin contends that Segregation Unit Step 3 inmates are similarly situated to Treatment Center Step 3 inmates and that there is no legitimate security reason for not allowing inmates to have their handcuffs attached to a tether, instead of their waist restraint belt, while using the Treatment Center law library.

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Often an equal protection violation occurs when a state actor draws distinctions among people based on a person's membership in a "suspect" class. *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir. 2002). Suspect classes include race, alienage, and national origin. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006). Another typical equal protection challenge is based on denial of a fundamental right. *Id.* Fundamental rights include freedom of speech and religion. *Id.* With

17

both suspect classes and denials of fundamental rights, the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause. *Id.*

Prisoners retain their right to equal protection; nonetheless, where the disparate treatment is not based on a suspect class, as in this case, a prison may treat inmates differently if the unequal treatment is rationally related to a legitimate penological interest. *See May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000); *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988); *see also Vision Church*, 468 F.3d at 1000-01 (in the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of review is rational basis). Rational basis review requires the plaintiff to prove that (1) the state actor intentionally treated plaintiff differently from others similarly situated; (2) this difference in treatment was caused by the plaintiff's membership in the class to which he belongs; and (3) this different treatment was not rationally related to a legitimate state interest. *Smith v. City of Chicago*, 457 F.3d 643, 650-51 (7th Cir. 2006).

Here, the undisputed facts reveal that Treatment Center inmates and the Segregation Unit inmates are subjected to different law library restraint procedures based on differences in the construction of the law library rooms and differences in the threat level of the inmates within the units. The Segregation Unit law libraries are secure and were constructed to hold disruptive and dangerous inmates. The computer is secured behind Plexiglas, the door is locked, the chair is bolted down, and the entire room can be easily viewed for monitoring. The inmate using the computer has his waist belt unfastened and handcuffs attached to a tether, and the tether is then attached to a u-bolt on the computer station or chair. The inmate's legs and wrists remain in restraints but it is not necessary to leave his wrist cuffs attached to the waist restraint given the highly secure nature of the room.

In contrast to the Segregation Unit law library, the Treatment Center law library was

not constructed to hold segregation status inmates. The computer sits out freely, the chair is free standing, and the door is designed so that anyone inside the room can leave at any time. One section of the room is out of view from the door and a glass window that accesses outside is in this corner area.

The Treatment Center also houses a more diverse population of inmates than the Segregation Unit, including inmates who are on segregation status and general population inmates who are on the unit to receive medical or psychological services. While some Treatment Center inmates may use the law library computer with no restraints, inmates who are still on segregation status, like Polzin was, are required to be restrained in handcuffs and a waist restraint because the room is not secure. Finally, while Step 3 inmates may be housed in either the Treatment Center or the Segregation Unit, the restraints used differs because of the differences in inmate population and room security.

Polzin contends that another chair should be bolted down in the Treatment Center law library (one already is bolted down for conduct report hearings) which would enable inmates to have their handcuffs secured to a tether so they could use the computer without their handcuffs secured to a waist restraint, like in the Segregation Unit. However, Polzin's suggestion does not address other differences between the law libraries such as the computer, the room layouts, the door, and the population of inmates housed on the unit. More importantly, his suggestion ignores Security Director Ericksen and Warden Baenen's decision that the best way to protect equipment, staff, and other inmates in the Treatment Center law library is to use wrist restraints attached to a waist belt for higher risk inmates, which restricts or limits the movement of arms and minimizes their ability to cause a disturbance. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

The record reveals that Treatment Center inmates are restrained differently than

Segregation Unit inmates while using the law libraries because the inmates housed in the units pose varying threat levels. The inmates are also restrained differently because the law library rooms are constructed differently; the Segregation Unit law libraries are more secure. In short, the inmates are not similarly situated. Additionally, the manner in which certain inmates are restrained in the Treatment Center law library is based on institution security, which is a legitimate penological interest. *See May*, 226 F.3d at 882. Hence, the Court will grant the defendants' motion for summary judgment as to Polzin's equal protection claim.

## B. Excessive Force

The defendants contend that they should be granted summary judgment on the excessive force claim because Kazik applied force in good faith and because any forced used was *de minimis*. Alternatively, the defendants contend that they are entitled to qualified immunity. Polzin, on the other hand, contends that Kazik did not apply force in good faith and that the force used was not *de minimis*. Polzin also contends that the defendants are not entitled to qualified immunity.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. The test for determining whether a prisoner has suffered cruel and unusual punishment has both an objective and a subjective component. The objective component focuses on whether, in light of "contemporary standards of decency," the alleged deprivation was sufficiently serious and the subjective component focuses on whether the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). In the excessive force context, the two components, "as a practical matter, collapse into a single inquiry because '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency' . . . 'always are violated.'" *Thomas v. Stalter*, 20 F.3d 298, 301 (7th Cir. 1994) (quoting *Hudson*, 503 U.S. at 9).

In determining whether an officer has used excessive force against a prisoner, the question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). The factors relevant to this determination include: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

The Seventh Circuit Court of Appeals has considered a number of cases where a plaintiff claimed that handcuffs were too tight. In *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003), the court determined that summary judgment was inappropriate for an officer who allegedly "grabbed [a suspect's] left arm, jerked it into handcuffing position, forced her arm behind her back, slammed the handcuff down on her wrist, jerked her wrist, and tightened the handcuffs until [she] could not feel her hands, . . . [and refused to] loosen the handcuffs or remove them until she arrived at the police station" even though the suspect "protested that the handcuffs were too tight, that she could not feel her hands, and that she was in pain," *id.* at 774-75. Summary judgment was also inappropriate in *Herzog v. Village of Winnetka*, 309 F.3d 1041 (7th Cir. 2002). In that case, the plaintiff produced evidence that the arresting officer shoved her to the ground even though she was not resisting, cracked her tooth by forcing a breath-screening device into her mouth, and waited over an hour to loosen handcuffs which she complained were too tight. *Id.* at 1043-44. In *Lester v. City of Chi.*, 830 F.2d 706, 714 (7th Cir. 1987), the court determined that it was appropriate for a jury to decide whether force applied was excessive for claims that officers, even after the plaintiff allegedly

21

did not resist arrest, threatened to punch her, kneed her in the back, dragged her down a hallway, and handcuffed her so tightly her wrists were bruised.[3]

On the other hand, with respect to claims that handcuffs were applied and kept too tightly, courts have found no viable constitutional claim where the plaintiff complained to the officers only a few times and the evidence could not establish that officers were aware that the cuffs were causing serious pain or injury. *See Sow v. Fortville Police Dept.*, 636 F.3d 293, 304 (7th Cir. 2011); *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009); *Tibbs v. City of Chicago*, 469 F.3d 661, 663 (7th Cir. 2006). In *Sow*, 636 F.3d at 304, the court of appeals affirmed summary judgment where the plaintiff complained only once about his cuffs being too tight, but never elaborated on his complaint. In *Stainback*, 569 F.3d at 773, summary judgment was proper where the arrestee simply asked officers not to cuff him behind his back but did not inform them that he had a preexisting injury. Although the plaintiff allegedly suffered a rotator-cuff injury necessitating surgery as a result of being handcuffed, the summary judgment evidence demonstrated that the officers were not made aware of a preexisting condition and the plaintiff voiced only general complaints of pain after being cuffed. *Id.* at 769, 773. In *Tibbs*, the court of appeals affirmed summary judgment where the plaintiff complained twice following his arrest about handcuffs being too tight, his wrists were red for one and one-half days, and he requested no medical care for his wrists. *See Tibbs*, 469 F.3d at 663.

In this case, Polzin avers that on August 1, 2010, Kazik placed the handcuffs on him as tight as they would go and that they pinched his wrists and caused him pain. He further avers that

---

[3] *Payne*, *Herzog*, and *Lester* involved claims of excessive force during arrest and therefore the objective reasonableness standard set forth in *Graham v. Connor*, 490 U.S. 386, 396-97 (1989), applied to determine whether officers used excessive force. Under that standard, reasonableness is judged from the perspective of whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting the officer at the time. *Id.*

Kazik placed the waist restraint on him as tight as it would go. Polzin complained that the handcuffs and waist restraint were too tight twice, once at his cell and once again after he and Kazik arrived at the law library. Kazik refused to loosen the handcuffs or restraints, stating that he was doing what he was supposed to do and that Polzin was required to work in the library with handcuffs and a waist restraint. Polzin worked in the law library for forty-five minutes. He had to wrench his wrists to use the computer and write because the handcuffs were too tight. (Kazik disputes that the handcuffs and restraints were too tight.) It was painful and finally he left the library and went to the sergeant's station where Sergeant Platten loosened the handcuffs and waist restraint. Polzin went back to the library and when Kazik returned to escort him back to his cell, Polzin told him that Sergeant Platten loosened the handcuffs and restraints. According to Polzin, Kazik replied that inmate Harris had only lasted fifteen minutes because of the pain. Three days after the incident, Polzin filed a HSR complaining of pain in his right wrist. The nurse assessed him on August 6, 2010, and his wrist appeared normal with no swelling or discoloration. She gave him Ibuprofen and instructed him to use warm moist compresses on the affected area. Polzin was diagnosed with low grade tendinitis on September 29, 2010. Dr. Heidorn does not believe the tendinitis is from August 1, 2010, incident although Polzin avers that he did not have any problems or pain with his right wrist prior to that date.

Viewing the evidence in the light most reasonable to Polzin, a reasonable fact finder could not conclude that Kazik used excessive force in violation of the Eighth Amendment. Polzin complained twice to Kazik that the handcuffs were too tight. Kazik did not loosen the handcuffs. Rather, he replied that he was doing what he was supposed to do and that Polzin was required to work in the law library in that manner. Polzin's wrist did not show any marks or bruising five days after the incident and there is no evidence in the record linking Polzin's subsequent low grade tendinitis diagnosis with Kazik's placement of the handcuffs on Polzin on August 1, 2010. The

23

record does not support a finding that Kazik maliciously and sadistically used force to harm Polzin. Therefore, the defendants' motion for summary judgment on Polzin's excessive force claim will be granted.

## C. State Law Claims

### 1. Wis. Stat. § 302.08

The defendants contend that Polzin's claim based on Wis Stat. § 302.08 should be dismissed because the statute does not create a private right of action. Polzin states that he will not pursue his claim under Wis. Stat. § 302.08 and is not opposed to dismissal of the claim. Therefore, this state law claim will be dismissed.

### 2. Wis. Admin. Code § DOC 306.11

The defendants contend that Polzin's claim based on Wis Admin. Code § DOC 306.11 should be dismissed because the provision does not create a private right of action. Polzin contends that his claims based on Wis. Admin. Code § DOC 306.11 should not be dismissed and that the Court should construe the claim as a state law negligence claim. However, Polzin was not permitted to proceed under a negligence claim. Moreover, he has offered no authority to suggest that he has a right to bring a civil suit under the Wisconsin Administrative Code. *See, e.g., Ludke v. Kettle Moraine Corr. Inst.*, No. 11–CV–506, 2011 WL 5125923, at *5 (E.D. Wis. Oct. 28, 2011) (prisoner could not sue under § 940.29 or under state DOC regulations). Therefore, Polzin may not proceed on this claim and it will be dismissed.

### 3. Defendant Baenen

The defendants contend that the state law claims against Baenen should be dismissed for failure to comply with Wisconsin's Notice of Claim statute. Polzin acknowledges that he did not name Baenen in his notice of claim that he filed with the state pursuant to Wis. Stat. § 893.82. He

is not opposed to dismissal of his state law claims against Baenen.  Therefore, Baenen will be dismissed.

### 4. Battery Claim Against Kazik

The defendants contend that summary judgment should be granted in favor of Kazik on Polzin's battery claim.  Alternatively, the defendants contend that the Court should decline to exercise supplemental jurisdiction over the state law claim.   Polzin contends that Kazik committed a battery against him.

In the absence of any surviving federal claims, the general rule is that the Court should decline to exercise supplemental jurisdiction over state law claims.  See 28 U.S.C. § 1367(c); *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).  However, the Court should retain jurisdiction when the statute of limitations has run.  *See Sharp Elec. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009).  The statue of limitation for Polzin's battery claim is three years.  Wis. Stat. § 893.57.  Because the incident took place in 2010, it appears that the statute of limitations has run.  Therefore, the Court will address the claim.

Under Wisconsin law, a battery or assault and battery is a common law tort that has been defined as an intentional contact with another, which is unpermitted. *Estate of Thurman v. City of Milwaukee*, 197 F. Supp. 2d 1141, 1151 (E.D. Wis. 2002) (citing *McCluskey v. Steinhorst*, 45 Wis.2d 350, 357, 173 N.W.2d 148 (1970)).  A battery occurs if (1) the defendant intentionally caused offensive contact with the plaintiff and (2) the plaintiff did not consent to the contact.  Wis. JI–Civil 2005.5.  Contact is offensive if a reasonable person in the plaintiff's situation would have been offended by the contact. *Id.*  The intent requirement means that the defendant had the mental purpose to cause the offensive contact "or was aware that his or her conduct was practically certain" to do so.  Wis. JI–Civil 2005.5.

25

There is no doubt that, as a correctional officer, Kazik is permitted to handcuff Polzin, an inmate. The question is thus whether Kazik committed a battery against Polzin by placing handcuffs on him that were too tight and refusing to loosen them. However, despite the fact that Polzin complained twice that the handcuffs were too tight, Kazik insisted that he (Kazik) was doing what he was supposed to do and that Polzin was required be restrained with handcuffs and a restraint belt in the law library. In short, the contact was permitted and Kazik did not have a mental state to harm Polzin. Accordingly, Polzin's state law battery claim will be dismissed.

**IT IS THEREFORE ORDERED** that the defendants' original motion for summary judgment (Docket # 28) is **denied as moot**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket # 41) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 29th day of August, 2014.

SO ORDERED,

**HON. RUDOLPH T. RANDA**
**U. S. District Judge**

26